# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>                    v.<br><br>THOMAS VINCENT GIRARDI, and<br>CHRISTOPHER KAZUO KAMON,<br><br><br>        Defendants. | Case No. 2:23-CR00047-JLS<br><br>**ORDER DENYING DEFENDANT KAMON'S MOTION TO EXCLUDE OTHER ACTS EVIDENCE (DOC. 189 & 191)**<br><br>**ORDER DENYING GOVERNMENT'S MOTION TO EXCLUDE EXPERT TESTIMONY (DOC. 188)**<br><br>**ORDER GRANTING DEFENDANT GIRARDI'S MOTION FOR JUROR QUESTIONNAIRE (DOC. 186)** |

Presently before the Court are (1) the motion of Defendant Kamon to exclude evidence that is in the nature of "other acts" evidence; (2) the motion of the Government to exclude report and testimony of Dr. Chui, an examining neurologist; and (3) the motion of Defendant Girardi for a case-specific juror questionnaire.  These matters were heard on June 20, 2024.  For the reasons and in the manner set forth herein, the Court DENIES both Motions to Exclude and GRANTS the Motion for Juror Questionnaire.

## I.     BACKGROUND

The present case charges Defendants Girardi and Kamon on five counts of wire fraud related to a scheme to defraud five clients of settlement funds transferred to the client trust accounts[1] of the now-defunct law firm, Girardi Keese.  According to the Indictment, Defendant Girardi was the sole owner and managing partner of the firm; Defendant Kamon was its Controller and Chief Financial Officer ("CFO").  The case set for hearing (and for trial on August 6, 2024), is "the main case," involving "the main scheme."  There is a "related case" involving a "side scheme,"[2] which was filed against Defendant Kamon only.

The charged wire fraud counts involve an alleged scheme to withhold settlement funds due to clients after such funds were transferred into client trust accounts maintained by Girardi Keese.  (*See generally* Doc. 1 (Indictment).)  The Indictment charges that such funds were purposely withheld from the clients and, while the clients were given various excuses for the non-distribution of those funds, Defendants diverted the settlement funds and used them for purposes unrelated to those clients.  (*Id.* at 4-6; *see id.* at 6-14 (alleging specific details as to each of the five clients))  Both Defendants are alleged to have "knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim clients . . . and to obtain money and property from such victim clients by means of material[ly] false and fraudulent pretenses, representations, and promises, and the concealment of material facts."  (*Id.* at 4.)

The present case involves allegedly diverted client settlement funds in the amount of over $15 million from five client-victims identified in the Indictment only as "Client 1"

---

[1] As charged, four of the five counts relate to transfers of funds from two "Interest on Lawyer's Trust Accounts" (or "IOLTAs"), which are referred to as the "Torrey Pines IOLTA Account" and the "Nano Banc IOLTA Account."  (Indictment at 2.)  Count 5 refers to transfer from a Girardi Keese operating account, but alleges that "the source of . . . funds was, in part, the settlement proceeds belonging to" one of the client victims.  (*Id.* at 16.)

[2] At the hearing, Government counsel noted that the "side scheme" is more appropriately characterized as a "supplemental scheme."

through "Client 5" (but the names of those client-victims are known to the parties).  (*Id.* at 14-15.)  The scheme to defraud allegedly began "as early as in or around 2010 and continu[ed] through . . . around December 2020."  (*Id.* at 4.)  The charged offenses involve five wire transfers of funds, the first of which occurred on June 17, 2019 and the last of which occurred on July 9, 2020.  (*Id.* at 15-16.)

In a separate case against Defendant Kamon only, he is charged with an additional count of wire fraud.  *See United States v. Kamon*, No. 2:23-CR-00024 (C.D. Cal.) (Doc. 39 (Information)).  The scheme charged in the Information began as early as 2015, continuing through December 2020, and involved Defendant's Kamon's alleged illicit transfers of funds held by Girardi Keese to (1) "Company 1," (2) to an individual referred to as I.B., and (3) to unnamed others, referred to as "vendors."  (*Id.* at 2-4.)  Essentially, the "side scheme" case charges that Defendant Kamon made payments to others, making these payments appear as if they were legitimate business expenses, when in reality he was using these payments for his own purposes and the purposes of his "co-schemers."  (*Id.* at 3-4.)  The Information alleges that Defendant Kamon embezzled over $10 million from Girardi Keese in this manner, but it charges a single count of wire fraud, based upon funds transferred to Company 1 on September 20, 2020, in an amount just under $5,000.  (*Id.* at 4.)

## II.   DEFENDANT KAMON'S MOTION TO EXCLUDE "OTHER ACTS" EVIDENCE[3]

Defendant Kamon moves to exclude from admission at trial in this case all the evidence pertaining to the allegations in the related case briefly described in (and cited in)

---

[3] (Doc. 189 (Mot.); Doc. 191 (Amd. Mot.); Doc. 200 (Gov. Opp.); Doc. 201 (Girardi Opp.); Docs. 209-211 (Girardi Sealed Exs. 3, 4 & 6); Doc. 212 (Reply to Girardi Opp.) & Doc. 213 (Reply to Gov. Opp.).)  The "amendment" to the motion changed nothing in substance; it merely added the number-of-words certification required by Local Rule and added what is meant to be the meet-and-confer attestation required by Local Rule:  "Counsel have previously conferred and all are aware of the substance of the instant motion."  (Amd. Mot. at 2.)

the previous paragraph.[4]  This evidence is referred to broadly as "other acts" evidence. Defendant Kamon argues that the "other acts" evidence is propensity evidence, which is made generally inadmissible by Rule 404(a)(1).  Both the Government and co-Defendant Girardi argue that Rule 404 does not apply to this evidence because the evidence is "inextricably intertwined" with the charged offenses.  As set forth below, the Court agrees and holds that, generally, evidence of Defendant Kamon's alleged "side scheme" is admissible.

### A.    Legal Standard:  "Inextricably Intertwined" Evidence[5]

Evidence resembling Rule 404(b) "other acts" evidence may be admissible as "inextricably intertwined" with the charged offenses.  *United States v. Anderson*, 741 F.3d 938, 949 (9th Cir. 2013).  Evidence is "inextricably intertwined . . . when the acts in question are so interwoven with the charged offense that they should not be treated as other crimes or acts for purposes of Rule 404(b)."  *United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016).

There are two basic types of such evidence.  First, inextricably intertwined evidence "may constitute a part of the transaction that serves as the basis for the criminal charge." *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012) (cleaned up).  This first type has also been found where the "particular acts of the defendant are part of  a single criminal transaction."  *United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002) (cleaned up). Second, such evidence is admissible where it is "'necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'"  *Loftis*, 843 F.3d at 1178.

---

[4] Defendant's Motion paints with a broad brush, identifying the proffered evidence as a broad category of evidence rather than any specific materials or testimony.  Therefore, in this Order, the Court also addresses the parties' arguments generally, as relating to a broad category of materials and/or testimony.  The Court reserves finer points of admissibility for trial.

[5] Such evidence is also referred to by the more easily uttered term, "intrinsic evidence."  *See, e.g., Anderson*, 741 F.3d at 949; *United States v. Lague*, 971 F.3d 1032, 1038 n.5 (9th Cir. 2020).

**B.     The Proffered Evidence**

As noted, the broad category of evidence sought to be excluded relates to the "side scheme" charged in the related case:  Defendant Kamon allegedly made payments to Company 1, individual I.B., and other "vendors" as a manner of embezzling funds from Girardi Keese's operating accounts in an amount over $10 million.  Defendant Girardi's Opposition brief attaches his Exhibit 5, which is a detailed listing of a steady stream of payments (a total of 1,084 such payments, according to Defendant Girardi) from December 2013 through September 2020 that were made to, *inter alia*, Bravo Construction, totaling $6,593,076.56.   (*See* Girardi Opp. at 3 n.2 & Ex. 5.)

**C.     The Proffered Evidence is Inextricably Intertwined (or "Intrinsic")**

The two schemes alleged in this case and the main case are closely aligned.  In the main case, in Count 5, Defendant Kamon is accused of diverting funds due to Girardi Keese clients to pay his personal expenses.  In this sense, evidence of the side scheme meets the first type of inextricably intertwined evidence; specifically, the overlap of the two alleged schemes may "constitute[] a part of the transaction that serves as the basis for the criminal charge." *Loftis*, 843 F.3d at 1178.

More clearly, though, due to the relatedness of the two alleged schemes, evidence of the side scheme appears to the Court to be "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.*  In the related case, Defendant Kamon is accused of embezzling funds earmarked for Girardi Keese operations.  The main scheme allegedly provided the funds used by both Defendants, including funds that facilitated Defendant Kamon's alleged side scheme.  In this sense, evidence of the alleged side scheme may be admissible to explain certain characteristics and conduct of both Defendants within the alleged main scheme.  Defendant Kamon's alleged actions in diverting funds for his own purposes provides context for his participation in the main scheme, which the Government has described as aiding and abetting Defendant Girardi in the execution of this scheme.

Defendant Kamon's argument that the evidence is not inextricably intertwined relies in part on the distinction between Girardi Keese's operating accounts and client trust accounts.  (*See* Reply to Girardi Opp. at 9.)  Generally, the operating accounts were key in the alleged side scheme and the client trust accounts were key to the alleged main scheme. But this distinction is near meaningless in the context of these cases, which allege widespread fraud and non-compliance with accounting principles on a fundamental level. And the charging documents in these two cases do not distinguish between the client trust accounts and the operating accounts to the extent described by Defendant Kamon.  For example, Count 5 of the Indictment expressly charges that a Girardi Keese operating account (not client trust account) was used by Defendant Kamon to pay $15,000 to his American Express account for expenditures related to his Las Vegas residence. (Indictment at 16.)  Expressly alleged in Count 5 is that "the source of . . . funds" in the operating account "was, in part, the settlement proceeds belonging to" one of the client victims.  (*Id.*)  Moreover, as argued by Defendant Girardi, because Girardi Keese was a plaintiff's contingency fee law firm, most (if not all) of its revenue was derived from fees withheld from funds deposited into client trust accounts as the result of judgments or settlements from the clients' cases.  (Girardi Opp. at 13 n.7.)

This case is much like the case of *United States v. Soliman*, 813 F.2d 277 (9th Cir. 1987), where the Ninth Circuit found evidence admitted by the trial court to be inextricably intertwined with the charged offense.  In *Soliman*, in a previous related case, an insurance agent ("Ekaireb") was convicted of mail fraud in connection with a scheme involving forging death certificates and collecting insurance proceeds under lapsed life insurance policies.  *Id.* at 278.  The defendant ("Soliman"), who supervised Ekaireb, was later charged for his role in the scheme.  *Id.*  The Ninth Circuit found that a summary chart of evidence as to Ekaireb's submission of 102 fraudulent insurance claims was inextricably intertwined evidence admissible in the prosecution against Soliman, reasoning that: (1) Soliman was Ekaireb's supervisor while the scheme was ongoing; (2) the charges

against Soliman and Ekaireb were similar; and (3) the conduct resulting in charges against Soliman occurred in close proximity (as to both time and location) to the conduct resulting in Ekaireb's conviction.  *Id.* at 278-79.  Here, the two Defendants are alleged to have worked together in key executive positions at the same law firm, they face the same charges, the charged conduct relates to the misuse of funds in the bank accounts of the same law firm, and the alleged side scheme has a complete temporal overlap with the alleged main scheme.

Thus, as a general matter, evidence of the side scheme is admissible in the main case as inextricably intertwined evidence that is not subject to Rule 404.  Therefore, the Court DENIES Defendant Kamon's Motion to Exclude.

## III.   GOVERNMENT MOTION TO EXCLUDE EXPERT TESTIMONY[6]

As noted previously, one of the elements of the charged offenses is the specific intent to defraud, making Defendant Girardi's mental state (at the time of the charged offenses) relevant.  The Court previously considered the related issue of Defendant Girardi's competence to stand trial, which focused upon Defendant's present mental state.  The Court found Defendant to be competent to stand trial.  Specifically, on January 5, 2024, after a three-day evidentiary hearing, extensive pre- and post-hearing briefing, and consideration of extensive exhibits, including the reports of four experts, the Court issued its Order Finding Defendant Competent to Stand Trial.  (Doc. 150).

On June 5, 2024, Defendant Girardi's defense team filed the notice required by Federal Rule of Criminal Procedure 12.2(b)(1), advising the Government that it may call one of those four experts, Dr. Helena Chang Chiu, to testify as to "a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt." (*See* Doc. 204 (Rule 12.2(b)(1) Notice (disclosing that Dr. Chui may testify consistent with

---

[6] (Doc. 188 (Mot.); Docs. 197 & 206 (Chui Mar. 11, 2024 Expert Disclosure); Doc. 198 (Opp.); Doc 208 (Reply and Chui June 4, 2024 Supplemental Expert Disclosure).)

the defense expert disclosures of March 11, 2024 and June 4, 2024)).)  The Government moves to exclude Dr. Chiu from testifying, arguing that the proffered testimony is irrelevant and that its disclosure is inadequate.

As set forth below, the Court DENIES the Government's Motion to Exclude and sets forth some guidance regarding admissibility of the proffered expert testimony.

## A.    Proffered Evidence

### 1.    March 11, 2024 Expert Disclosure[7]

The March 11, 2024 Expert Disclosure takes the form of Dr. Chui's letter-report to defense counsel.  Therein, Dr. Chui notes that defense counsel asked her to evaluate four questions:  "(1) [T]he presence and etiology [(cause)] of Mr. Girardi's dementia; (2) the current severity of the dementia; (3) the progression of Mr. Girardi's dementia and (4) Mr. Girardi's prognosis."  (Mar. 11, 2024 Chui Rpt. at 1.)  Dr. Chui identifies herself as Defendant Girardi's "treating neurologist," but she has seen him only three times, twice in 2021 via telemedicine and a third time, in person, more than a year ago on April 13, 2023. (*Id.*)

As for the first question, the presence of and cause of dementia, Dr. Chui looks to an MRI image of Defendant Girardi's brain following a car accident in 2017 and to anecdotal accounts of changes to Defendant's Girardi's memory that followed this incident.  (Mar. 11, 2024 Chui Report at 3-7.)  The 2017 MRI suggests to Dr. Chui that there was already ongoing deterioration as of this date.  (*Id.* at 3-4.)  Most notably, Dr. Chui identifies atrophy of the temporal lobes and hippocampi.  (*Id.* at 4.)  Dr. Chui also relies on the January 2021 testing of Dr. Budding, 2023 testing by Dr. Wood, and Defendant's 2021 and 2023 MoCA scores.  (*Id.* at 6.)  As to the cause, Dr. Chui identifies a diagnosis of a neurogenerative disorder "associated with the accumulation of misfolded protein" of the brain, most likely "Limbic predominant Age-related TDP42 Encephalopathy," abbreviated

---

[7] (Doc. 197 ("Mar. 11, 2024 Chui Rpt.").)

as "LATE."  (*Id.* at 7.)

As for the second question, Dr. Chui opines that Defendant Girardi currently suffers from moderate dementia.  (*Id.* at 7-9.)  The third question relates to disease progression, and Dr. Chui opines that Defendant Girardi's cognitive function decline has been "slowly progressive between 2021 and the present."  (*Id.* at 10.)  As to the fourth and final question of prognosis, because there are no effective treatments, Dr. Chui expects Defendant Girardi's cognition is to continue to decline.  (*Id.*)

## 2.    June 4, 2024 Supplemental Expert Disclosure[8]

In the Supplemental Expert Disclosure, defense counsel describes opinions by Dr. Chui that may be offered at trial.  First, the defense expects Dr. Chui to testify regarding certain characteristics of what she identifies as Defendant Girardi's most likely diagnosis, LATE.  She is expected to testify that "LATE has been characterized as an amnestic cognitive syndrome that can evolve to incorporate multiple cognitive domains and ultimately impair activities of daily living, *i.e.*, dementia."  (June 4, 2024 Supp. Discl. at 2)

Second, she is expected to likewise draw a link between hippocampal atrophy and memory difficulties.  (*Id.* at 3.)

Third, as to the ability to continue functioning while suffering from cognitive decline, Dr. Chui is expected to opine on how persons with mild cognitive impairment can continue to work and function in a manner that is not particularly noticeable, "especially if the person has significant support staff or other help."  (*Id.* at 3.)  Patients may "mask their symptoms" to avoid embarrassment or for other reasons.  (*Id.* at 4.)  Therefore, Dr. Chui expects to opine that others may not have noticed earlier stages of Defendant Girardi's cognitive decline.  (*Id.* at 4-5.)  She is also expected to testify that persons with LATE "will continue to maintain their ability to engage in conversation . . . because LATE effects

---

[8] (*See* Doc. 208-1 (June 4, 2024 defense counsel letter to Government ("June 4, 2024 Supp. Discl.") attached to Gov. Reply brief).)

attention and language abilities less severely than memory." (*Id.* at 5.)

Fourth and finally, the defense has disclosed that Dr. Chui is expected to opine that "loss of insight, confabulation, and repetitive behaviors . . . are indicative of dementia," and that certain instances of Defendant Girardi's behaviors, observed by his former housekeeper, his legal assistant, and others, are examples of these types of behaviors. (*Id.*)

## B.   LEGAL STANDARDS

### 1.   Expert Evidence Bearing on the Issue of Guilt

Federal Rule of Criminal Procedure 12.2(b)(1) requires the defense to provide notice any time he "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition . . . bearing on . . .  the issue of guilt." Fed. R. Crim. P. 12(b)(1).  For a defendant to be found guilty of wire fraud, the prosecution must prove beyond a reasonable doubt the defendant's participation in a scheme to defraud and the defendant's specific intent to defraud.  *United States v. Brugnara*, 856 F.3d 1198, 1207-08 (9th Cir. 2017).  To have an "intent to defraud" requires that the defendant have an "intent to deceive and cheat."  *See United States v. Miller*, 953 F.3d 1095, 1102-03 (9th Cir. 2020).

### 2.   Preliminary Determination of Admissibility

Federal Rule of Evidence 104(a) provides that preliminary questions about admissibility may be made on the basis of evidence that is itself inadmissible.  It also provides that admissibility may be premised on the Court's factual findings on disputed issues, and that the Court may conduct (and in some instances must conduct) a hearing regarding admissibility outside the presence of the jury.  Fed. R. Evid. 104(a)-(c). Admissibility is determined by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

### 3.   Relevance

"Irrelevant evidence is not admissible." Fed. R. Evid. 402.  "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the

evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b).

### 4.    Admissibility of Expert Evidence

Federal Rule of Evidence 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, to be admissible under Rule 702, opinion testimony must be made by a qualified witness; it must be based on specialized knowledge; the opinion must be helpful to the understanding of other evidence or to the understanding of a fact in issue; the opinion must have a sufficient foundation in fact, that is, it must be "based sufficient facts or data"; and finally, it must be reliable, resting on a foundation of "reliable principles and methods" that have been "reliably applied."

In a criminal case, because such "matters are for the trier of fact alone," experts are precluded from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b).

The proponent of expert evidence has the burden of proving admissibility.  *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Expert testimony is admissible if the Rule 702(a)-(d) requirements are met by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 n.10 (1993) (discussing applicability of Federal Rule of Evidence 104(a) to expert testimony and citing *Bourjaily*, 483 U.S. at 175-76, for preponderance of evidence standard).  Exclusion of expert testimony is "the exception rather than the rule."  *See* Fed. R. Evid. 702, advisory committee note to 2000 amendment.  Therefore, "[s]haky but admissible evidence is to be

attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). The Rule 702(a) requirement that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance. *Primiano*, 598 F.3d at 564.

### C.    Limited Admissibility of Dr. Chui's Anticipated Testimony

In his Opposition, Defendant Girardi's defense team disavows the intent to present a diminished capacity defense, which requires that a defendant not have the capacity—that is, the ability—to form "'the culpable state of mind which defines the crime.'" (Opp. at 5 (quoting *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988)).) Instead, the defense represents that, consistent with Ninth Circuit case law, the defense intends to offer Dr. Chui's testimony to support an inference (to be argued by defense counsel) that Defendant Girardi did not, in fact, form a "culpable state of mind" sufficient to establish the elements of wire fraud. (*See* Opp. at 1, 5.) Specifically, Defendant Girardi relies upon *United States v. Rahm*, 993 F.2d 1405 (9th Cir. 1993) and other cases that have applied it.

*Rahm* involved a conviction for possession of counterfeit currency (in which the defendant maintained she did not have knowledge that the bill was counterfeit) where the district court excluded the testimony of a psychologist who administered two widely used standardized tests. *Id.* at 1409. These tests are designed to measure the subject's intelligence and to provide details regarding the characteristics of the subject's personality. *Id.* Based defendant's tests results, the expert would have testified that the defendant had a "consistent tendency to overlook visual details," and that her "overall personality style might be marked by lack of insight." *Id.* The Ninth Circuit reversed the conviction due to the exclusion of the expert's testimony. *Id.* at 1415-16. The court reasoned that the expert's testimony regarding the defendant's "diagnosed perceptual difficulties" was relevant to an element of the offense of conviction; namely, it was relevant to the defendant's knowledge of whether the bill was counterfeit. *Id.* at 1413. The court discussed how the defense was entitled to rebut the prosecution's evidence, by presenting

circumstantial evidence in the form of expert testimony, from which the jury might infer that the defendant lacked the requisite knowledge due to her "tendency to overlook visual detains" and the personality trait of a "lack of insight." *Id.* at 1414.

The Ninth Circuit applied *Rahm* and held similarly in *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002). *Finley* involved a prosecution for, *inter alia*, bank fraud. *Id.* at 1002. There, the defendant acquired fictitious documents, represented to him to be valid negotiable instruments by the leader of a group of people calling themselves the "Montana Freemen." *Id.* at 1003 & n.1. The defendant attempted to deposit those instruments, but two banks refused to honor the instruments, one bank gave him a copy of a "fraud alert" regarding the source of the documents, and three separate federal agencies notified the defendant that the documents were worthless. *Id.* at 1002-04. At trial for bank fraud, the defense proffered the testimony of a psychologist who would testify that the defendant had a "rigid" and "atypical belief system," which would allow the jury to conclude that he did not form the intent to defraud because he truly believed that the documents were valid negotiable instruments. *Id.* at 1004-05. The psychologist opined that the defendant "tended to hear what he wanted to hear and believed what he wanted to believe about someone." *Id.* at 1006 (verb tense altered). The district court excluded the psychologist's testimony, the defendant was convicted, and the Ninth Circuit reversed the conviction, holding that the excluded testimony should have been admitted. The Ninth Circuit noted that the psychologist's testimony was relevant to a determination of whether the defendant possessed the requisite *mens rea* for the crime, which required that the defendant "knowingly defraud various financial institutions." *Id.* 1012-14. According to the Ninth Circuit, an accurate assessment of an atypical belief system was outside the general knowledge of the average juror, and the psychologist's testimony would have assisted the trier of fact by "explain[ing] why a seemingly normal person could reject or distort certain overwhelmingly true information." *Id.* at 1013. However, the Ninth Circuit did make clear that the psychologist "would not be allowed to[] testify about [the defendant's] specific

beliefs with regard to the financial instruments." *Id*. at 1016.

*Cohen*, in which the Ninth Circuit also applied *Rahm* to reverse a conviction, is likewise similar. There, the defendant was convicted of income tax evasion, but professed the belief that "[p]aying and filing income tax are, by law, voluntary." *United States v. Cohen*, 510 F.3d 1114, 1117 (9th Cir. 2007). In *Cohen*, the defense contended the defendant "did not intend to violate the law," and proffered the testimony of a psychiatrist who would testify that that the defendant suffered from narcissistic personality disorder, which caused him to continue to believe something (that payment of federal income tax was wholly voluntary) despite overwhelming evidence to the contrary. *Id.* at 1122-23. In the psychiatrist's opinion, the defendant's personality disorder was such that his allegiance to this irrational fixed belief was impenetrable. *Id.* at 1122-23 (quoting expert report stating that the defendant's "'will was in the service of irrational beliefs as a result of narcissistic personality disorder'"). The psychiatrist explained that the defendant would reject any appeal to common sense, and that the defendant's fixed beliefs were "irrational to the point of dysfunction, [as] demonstrated by his stubborn adherence in the face of overwhelming contradictions [of his beliefs] and knowledge of a substantial penalty." *Id.* at 1123 (cleaned up). According to the Ninth Circuit, such evidence would have been helpful to the determination of whether the defendant acted willfully, which is an element of the offense of conviction. *Id.* at 1123-24. By excluding the expert's testimony, the trial court left the defendant "without any way to explain the effect that his mental disorder may have had on his ability to form the requisite *mens rea*." *Id.* at 1127. As in *Finley*, however, the Ninth Circuit noted that the psychiatrist's opinion would have to be circumscribed by the district court so as not to invade the province of the jury. *See id.* at 1126.

Defendant Girardi contends that the proffered testimony is much the same. He contends that Dr. Chui's testimony will assist the trier of fact in determining whether he formed the requisite intent to defraud and whether he participated in (or devised, or attempted to devise) a scheme to defraud. Accordingly, Dr. Chui's testimony will not be

that Defendant Girardi was incapable of forming the intent to defraud or incapable of participating in a scheme to defraud; instead, Dr. Chui's testimony will support an inference (giving the defense an evidentiary basis for arguing) that Defendant Girardi did not, in fact, form the intent and did not participate.

The Government argues *not* that Dr. Chui's testimony will usurp the jury's function by purporting to answer the ultimate question of intent, but rather that Dr. Chui's testimony lacks relevance because it does not go far enough in creating a "link between Girardi's purported condition and the 'intent to deceive and cheat.'" (Reply at 1.) The Government argues that, absent more direct testimony that Girardi's alleged condition is related to whether he could have had the required mental state, such testimony will leave the jury to speculate. *Id.* In addition, the Government argues that "Dr. Chui did not, and cannot, extrapolate backwards from her diagnosis in 2023 to give an accurate assessment of the defendant's cognitive abilities from 2010 to 2020." *Id.* at 3.

The Court agrees with Defendant Girardi that Dr. Chui's anticipated testimony is similar to the proffered testimony in *Rahm*, *Finley*, and *Cohen*. First, the Ninth Circuit's decision in *Rahm* disposes of the Government's argument that Dr. Chui does not go far enough in linking the mental condition to Defendant Girardi's state of mind. As the Ninth Circuit noted, experts, particularly those who deal in "matters of the mind," rarely "opine conclusively about a past occurrence" and are more likely to couch an opinion "in probabilities, in 'coulds' and 'mights.'" 993 F.2d at 1412. Overall, Dr. Chui may testify in a manner to give context to Defendant Girardi's mental state during the relevant time period. *See Diaz v. United States*, No. 23-14, 2024 WL 3056012 at *7 (U.S. June 20, 2024) (concurring opinion) (noting that experts are not precluded "from contextualizing a defendant's mental health condition, including by explaining the likelihood that those with a particular condition would have a particular mental state").

Nor is Dr. Chui precluded from testifying about the likelihood that Defendant Girardi had cognitive difficulties during a period of time before her 2023 diagnosis. The Court

rejects the Government's argument that the *post hoc* evidence cannot be analyzed (by an expert like Dr. Chui) as an indicator of what Defendant Girardi's mental state was during the relevant time period.  (*See* Reply at 3 (aptly describing such an analysis as "extrapolat[ing] backwards [in time]").)  Accordingly, to provide context supporting the defense theory, Dr. Chui may testify regarding her diagnosis, and how she arrived at that diagnosis.  She may testify regarding the characteristics of LATE, and explain the link between hippocampal atrophy and memory loss.  She also may testify regarding the progressive nature of LATE and the expected functioning of persons with such a diagnosis.

However, the Court intends to put guardrails on Dr. Chui's testimony to ensure that it is relevant to the issues in the case.  Specifically, Defendant Girardi's mental status is relevant only during the time period of the scheme charged in the Indictment, 2010 to December 2020, including, but not limited to the time of the charged conduct, July 17, 2019 through July 9, 2020.  (Indictment at 4, 15-16.)  Defendant Girardi's mental status after December 2020 is relevant only to the extent that it reflects upon what his mental status was during the relevant time period.  In contrast, Defendant Girardi's prognosis, which forecasts future events, is irrelevant and must be excluded for that reason.

The Court does note, however, that it does not appear from any disclosures that Dr. Chui is prepared to *directly* tie Defendant Girardi's condition to a lack of intent as to elements of the charged offense.  (*See, e.g.*, Reply at 1 (noting that Dr. Chui's "disclosure is bereft of any link between Girardi's purported condition and the 'intent to deceive and cheat.'").)  If the defense intends to offer testimony from Dr. Chui that specifically ties her diagnosis to issues related to intent, that point must be made in a supplemental disclosure. As it stands, the defense has disclosed expert testimony that will provide a basis upon which defense counsel may argue that the jury may infer a lack of intent.

## IV.   MOTION FOR JURY QUESTIONNAIRE[9]

As noted on the record, in light of the extensive publicity regarding Defendant Girardi and this case, including publicity resulting from Defendant Girardi's estranged wife's affiliation with the television show "Real Housewives" and related media, the Court will direct Jury Services to administer a written, case-specific questionnaire to potential jurors.  To facilitate the Court's review and to ensure that a questionnaire can be finalized in advance of the date set for the questionnaire's completion by potential jurors, the parties are to file their agreed-upon and (if necessary) disputed written voir dire questions no later than July 3, 2024, for the Court's consideration.

**IT IS SO ORDERED.**

DATED:  June 27, 2024

HON. JOSEPHINE L. STATON
United States District Judge

---

[9] (Doc. 186 (Mot.); Doc. 199 (Opp.); Doc. 207 (Reply).)